## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:  1:22-cv-00790

NORTHWEST BUILDING COMPONENTS, INC.,

                        Plaintiff,

v.

PHILIP D. ADAMS,

                        Defendant.

---

## MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

---

## <u>INTRODUCTION</u>

Plaintiff Northwest Building Components, Inc. ("NWBC") requires the emergency assistance of this Court to protect its business operations and trade secrets. NWBC is in the business of manufacturing, marketing, selling, and distributing trusses; roof, floor and stair components; framing; siding and other building materials and supplies, and providing services with respect thereto. NWBC provides high quality trusses for commercial, residential, and agricultural buildings. The market for trusses like those that NWBC sells is highly competitive.

Defendant Philip D. Adams ("Adams") is a former shareholder of NWBC.  After selling his shares in June of 2020, Adams became NWBC's General Manager, a position in which he oversaw 70 employees and exercised significant independent direction and control over NWBC's operations. Adams resigned from this position in October 2021.  Recently, NWBC

discovered that Adams now works for NWBC's competitor, Builders FirstSource, Inc. ("BFS").
In connection with his work for BFS, Adams is using NWBC's confidential and trade secret
information to contact NWBC's customers and steal jobs from NWBC, in direct violation of
trade secret laws and his agreements with NWBC. In addition, NWBC believes that Adams is
wrongfully taking advantage of NWBC's strong reputation and acquired goodwill by falsely
holding himself out as still working with NWBC. As a result of Adams' actions, NWBC has
already lost multiple orders about which the company has knowledge, and likely additional
orders about which the company does not have knowledge. If Adams is not restrained from
continuing to work for a competitor, continuing to solicit NWBC's clients, continuing to hold
himself out as still working for NWBC, and continuing to misappropriate NWBC's confidential
and trade secret information, NWBC will be immediately and irreparably harmed. For these
reasons and the reasons set forth below, the Court should grant NWBC's Emergency Motion for
Temporary Restraining Order and Motion for Preliminary Injunction.

## FACTS

**A.    NWBC's Business and Trade Secrets.**

NWBC is in the business of manufacturing, marketing, selling, and distributing trusses;
roof, floor and stair components; framing; siding and other building materials and supplies, and
providing services with respect thereto. Verified Complaint for Injunctive Relief ("Compl.") ¶ 8.
NWBC supplies high quality roof and floor trusses for commercial, residential, and agricultural
buildings and specializes in all areas of wood construction. *Id.* The market for high quality roof
and floor trusses is highly competitive. *Id.* ¶ 9.

NWBC has invested substantial effort, time, and money in developing and maintaining its

confidential information and trade secrets. *Id.* ¶ 10. This information includes, without limitation, customer lists, customer preferences, vendor lists, pricing terms, inventory lists, commodity margins, and information concerning prospective customers and engagements, such as project proposals. *Id.*

To protect and preserve its confidential information and trade secrets, NWBC uses fire-walls, antivirus software, intrusion protection and detection systems, encryption mechanisms, physical safeguards, and regular server backups. *Id.* ¶ 11. NWBC also limits who has access to its confidential and trade secret information. *Id.* NWBC further protects such information through the use of restrictive agreements and by initiating litigation, such as this lawsuit, when necessary. *Id.* NWBC's confidential information and trade secrets provide it with a business advantage over competitors that do not have access to, or knowledge of, the confidential information or trade secrets. *Id.* ¶ 12.

**B.    Adams Signed a Restrictive Agreement.**

Prior to June 1, 2020, Adams was a shareholder of NWBC. *Id.* ¶ 13. Effective as of June 1, 2020, Adams entered into a Stock Purchase Agreement, pursuant to which, among other things, he sold his ownership interest in NWBC to Kodiak Building Partners, LLC ("Kodiak"). *Id.* ¶ 14. At the same time, Adams entered into an employment relationship with NWBC. *Id.* ¶¶ 15-16. On or about June 1, 2020, Adams signed the Employment Agreement, attached to the Complaint as Exhibit 1 (the "Agreement"). *Id.*; *see also id.* Ex. 1. Pursuant to the Agreement, Adams would be NWBC's General Manager. *Id.* ¶ 15. The Agreement outlined Adams' compensation, including a generous annual salary, bonus program, and additional benefits. *Id.* ¶ 17.

The Agreement also outlined Adams' obligations with respect to confidential information. *Id.* ¶ 18. Section 10 of the Agreement ("Agreement Confidentiality Provision") provides, *inter alia*:

> Employee [Adams] acknowledges that prior to and during Employee's employment with the Company [NWBC], Employee has learned and will continue to learn and have access to the trade secrets and confidential and proprietary information of the Company and other members of the Company Group [Kodiak, NWBC, and each of their respective subsidiaries and affiliates], including but not limited to, business plans, financial information, customer lists, vendor lists, pricing terms, marketing and sales information and intellectual property and other proprietary information which may or may not be covered by applicable trade secret laws (the "Confidential Information"). Employee agrees that such Confidential Information is and shall remain the exclusive property of the Company or the applicable member of the Company Group. Employee agrees at all times during Employee's employment with the Company and after the termination thereof for any reason, to do the following: (i) hold all Confidential Information in trust for the benefit of the Company and other members of the Company Group and to take steps as may be reasonable and/or necessary to maintain its confidentiality; (ii) use any Confidential Information of which Employee has or will become aware only as may be authorized by the Company and for the sole purpose of performing work for the Company or other members of the Company Group, as applicable; and (iii) not use for Employee's improper benefit or the improper benefit of others, or disclose, divulge or convey to any third party, any Confidential Information obtained by or known to him without the prior written consent of the Company.

*Id.*; *see also* Compl. Ex. 1 § 10.

Pursuant to Section 4 of the Agreement, Adams and NWBC also agreed to concurrently execute a Restrictive Covenant Agreement ("RCA"), attached as Exhibit A to the Agreement. Compl. ¶ 19-20. The RCA contains several restrictions, including a Non-Competition Provision, Non-Solicitation Provision, Confidentiality Provision, and Non-Interference Provision (collectively, "Restrictions"). *Id.* ¶¶ 21-26.

The Non-Competition Provision provides that while employed with NWBC and for a period of one year after the termination of his employment (the "restricted period"), Adams

would not work for or be otherwise involved with a company that competes with NWBC's

Business in, among other places, the states of Idaho and Washington. *Id.* ¶ 21; *see also* Compl.

Ex. 1 at RCA § 1.

Adams also agreed that during the restricted period he would not "induce, canvass,

solicit, procure or accept the business of, or assist the inducement, canvassing or soliciting,

procurement of or acceptance of the business of, any individual, entity or other party that is or

was (i) a customer or client or prospective customer or client of [NWBC] . . . or (ii) a customer

or client or prospective customer or client of the [NWBC] . . . at any time within 12 months prior

to the date of termination of Employee's employment with [NWBC]." Compl. ¶ 23; Compl. Ex.

1 at RCA § 2.

Adams also agreed to protect NWBC's Confidential Information. Compl. ¶¶ 18, 24-25;

Compl. Ex. 1 at RCA § 3; *see also* Compl. Ex. 1 § 10. Similar to the Agreement, the RCA

defined Confidential Information to include proprietary business information and trade secrets,

including the following:

> (1) information regarding the Company's or any other member of the Company Group's
> operations, assets, liabilities, plans, prospects, affairs or financial condition; (2)
> information regarding the Company's or any other member of the Company Group's
> pricing, sales, merchandising, marketing, capital expenditures, costs, joint ventures,
> business alliances or purchasing; (3) customer lists or other information regarding the
> Company's or any other member of the Company Group's current or prospective
> customers; (4) information regarding the Company's or any other member of the
> Company Group's vendors, suppliers, distributors or other business partners; (5)
> forecasts, projections, budgets and business plans regarding the Company or any other
> member of the Company Group; (6) the Company's or any other member of the
> Company Group's trade secrets and proprietary information; and (7) the Company's or
> any other member of the Company Group's website designs, website content, proposed
> domain names, and databases.

Compl. ¶ 25; Compl. Ex. 1 at RCA § 3(b); *see also* Compl. Ex. 1 § 10 (defining Confidential Information as including: "business plans, financial information, customer lists, vendor lists, pricing terms, marketing and sales information and intellectual property and other proprietary information which may or may not be covered by applicable trade secret laws").

Finally, in agreeing to the Non-Interference Provision, Adams agreed that he would not "interfere or attempt to interfere with" NWBC's business "or persuade or attempt to persuade any customer, prospective customer, employee or supplier of the Company, or any other member of the Company Group, to discontinue or alter such individual, entity or other party's relationship with the Company." Compl. ¶ 26; Compl. Ex. 1 at RCA § 4.

Adams acknowledged that his compliance with the Restrictions "is necessary for the reasonable and proper protection of the trade secrets, Confidential Information, substantial relationship with prospective and existing customers, and customer goodwill," and that "each and every one of the restraints is reasonable in respect to subject matter, length of time, scope of activity and geographic area . . . ." Compl. ¶ 30; Compl. Ex. 1 at RCA § 6. He also acknowledged that if he violated any of the Restrictions, NWBC could suffer irreparable harm and agreed that NWBC would be entitled to a temporary restraining order and an injunction restraining Adams from the commission of such breach. Compl. ¶¶ 31-32; Compl. Ex. 1 §§ 10, 13; Compl. Ex. 1 at RCA § 15. The Agreement also provides that "in the event of a breach of any of the covenants contained in [the Agreement Confidentiality Provision], in addition to any other remedy which may be available at law or in equity, the Company or the other applicable members of the Company Group will be entitled to specific performance and injunctive relief without posting bond." Compl. ¶ 32; Compl. Ex. 1 § 10.

During Adams' employment with NWBC, he had knowledge of and access to customer lists, vendor lists, pricing terms, and inventory lists prepared by NWBC for the purpose of soliciting customer business, among numerous other types of NWBC confidential information and trade secrets. *Id.* ¶ 36.

**C.     NWBC Discovers Adams Is Breaching The Agreement And RCA.**

On October 11, 2021, Adams resigned from NWBC. *Id.* ¶ 37. At that time, he told NWBC President John Mandere that he did not know what he would do next. *Id.*

In or around January or early February 2022, NWBC heard a rumor that Adams had started to work for BFS, a direct competitor of NWBC. *Id.* ¶¶ 38-39. Like NWBC, BFS supplies structural building products, including roof and floor trusses, for residential buildings. *Id.* ¶ 39. BFS is located in Washington, which is within the geographic scope of the RCA. *Id.* ¶¶ 40-41.

Shortly after NWBC heard a rumor about Adams working for BFS, Adams contacted a current NWBC employee to attempt to obtain NWBC's confidential business information, including information regarding the scheduling of customer orders. *Id.* ¶ 42. Upon information and belief, Adams wanted the information for use in connection with his employment with BFS. *Id.* Subsequently, on March 2, 2022, a different employee went to lunch with Adams. *Id.* ¶ 43. During the lunch, Adams did not say anything about working for BFS. *Id.* Then, on or around March 10, 2022, NWBC received confirmation from a third party that Adams was working for BFS. *Id.* ¶ 44. By working for BFS, Adams is breaching the Non-Competition Provision of the RCA. *Id.* ¶ 45.

In response to the news that Adams had joined BFS, NWBC reviewed its recent cancelled orders and discovered that one of its long-time customers cancelled four of its existing

orders. *Id.* ¶ 46. At this time, the customer told NWBC that they were going to use BFS for those orders. *Id.* Despite being a long-time, repeat customer, the customer has not placed any orders with NWBC since. *Id.*

A few days later, NWBC learned that Adams is deceiving NWBC customers by holding himself out as still working for NWBC. *Id.* ¶ 47.  On or around March 17, 2022, NWBC called a different customer regarding an upcoming job. *Id.* ¶ 48. The customer was surprised to hear from NWBC and informed NWBC that he had already talked with Adams about the job. *Id.* Adams had not informed the customer that he no longer worked for NWBC, and the customer did not understand this until NWBC called to discuss the job. *Id.* Ultimately, because Adams and BFS had already fulfilled the customer's needs, the customer cancelled the job with NWBC. *Id.* Adams' actions violate the Non-Solicitation Provision, the Non-Interference Provision, RCA Confidentiality Provision, and the Agreement Confidentiality Provision. *Id.* ¶ 49.

## **ARGUMENT**

### A.    NWBC IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION TO PRESERVE THE STATUS QUO.

The purpose of a temporary restraining order or preliminary injunction is to preserve the status quo between the parties pending a final determination on the merits. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980); *Bray v. QFA Royalties LLC*, 486 F. Supp. 2d 1237, 1241 (D. Colo. 2007). The status quo is "the last uncontested status between the parties which preceded the controversy." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001). To determine the status quo for a preliminary injunction, the "court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Id.*

Here, the status quo is the point prior to Adams misappropriating NWBC's trade secrets and becoming employed by BFS. At that point in time, NWBC maintained its confidential information and trade secrets without risk that such information would be given to a competitor by a former employee, and Adams was not employed by or otherwise affiliated with a competitor.

**B.    NWBC SATISFIES EACH ELEMENT NECESSARY TO OBTAIN A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION.**

The decision to grant a temporary restraining order or other injunctive relief lies within the Court's discretion. *Dominion*, 269 F.3d at 1153. Equitable relief is warranted where the moving party demonstrates: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction will not adversely affect the public interest. *Id.* at 1154. NWBC satisfies each of these elements.

**1.    NWBC Will Succeed on Its Claims Against Adams.**

In its Verified Complaint, NWBC has asserted claims for Adams' breach of his contract (Count I), misappropriation of trade secrets pursuant to the Federal Defend Trade Secrets Act (Count II) and the Colorado Uniform Trade Secrets Act (Count III), Conversion (Count IV), Civil Theft (Count V), Tortious Interference with Contract (Count VI), Tortious Interference with Prospective Business Advantage (Count VII); Unjust Enrichment (Count VIII), and Unfair Competition pursuant to the Lanham Act (Count IX) and Common Law (Count X). As discussed below, NWBC will succeed on each of these claims.

a. <u>Breach of Contract Claim.</u>

NWBC is likely to succeed on its breach of contract claim against Adams. The Agreement, including the RCA, is enforceable, and Adams has breached and threatens to breach multiple provisions of the Agreement, including the Non-Competition, Non-Solicitation, Non-Interference, and Confidentiality Provisions.

Claims arising under or in connection with the Agreement are governed by Colorado law. Compl. Ex. 1 § 13 & RCA § 14. Therefore, Colorado law applies to the state law claims in this case. To prove its breach of contract claim under Colorado law, NWBC must show: (1) the existence of a contract, (2) performance by NWBC or some justification for nonperformance, (3) defendant's failure to perform the contract, and (4) resulting damages to NWBC. *Campbell v. Summit Plaza Assoc.*, 192 P.3d 465, 475 (Colo. App. 2008). NWBC can prove each element.

   i. *The Non-Compete and Other Provisions Are Enforceable.*

Covenants not to compete are enforceable where they are not prohibited by statute and are reasonable. *DISH Network Corp v. Altomari*, 224 P.3d 362, 365-68 (Colo. App. 2009); *Boulder Medical Center v. Moore*, 651 P.2d 464, 466 (Colo. App. 1982); *Harrison v. Albright*, 577 P.2d 302, 304 (Colo. App. 1977). Colorado's statute on non-compete provisions (C.R.S. § 8-2-113(2)) expressly permits covenants not to compete that are either a "contract for the protection of trade secrets" or a contract involving "Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel." Moreover, a covenant not to compete should be enforced where it is reasonable in its duration and geographic scope. *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1063

(Colo. 2011). For several reasons, the Non-Competition, Non-Solicitation, and Non-Interference Provisions to which Adams agreed are valid and enforceable under Colorado law.

First, the Agreement and RCA are intended to protect trade secrets. The RCA expressly states that the Restrictions are intended to protect NWBC's confidential information, including its trade secrets. Compl. Ex. 1 at RCA p.1 (stating that the purpose of the RCA's Restrictions is to "protect the legitimate business interests of the Company . . . including their trade secrets, valuable confidential business and professional information, substantial relationships with prospective and existing customers, and customer goodwill, and reduce the likelihood of irreparable damage which would occur in the event such information and goodwill is provided to or used by a competitor"). Further, Adams' position at NWBC afforded him access to NWBC's most valuable trade secrets. And the information that Adams possesses are classic trade secrets, including, without limitation, information about NWBC's products, vendors, pricing, margins, budgets, upcoming jobs, customers, and the identities of the clients' decisionmakers and the clients' preferences. Furthermore, it is exactly this trade secret information that Adams is using in connection with his work for BFS. The Restrictions were designed to protect those trade secrets by preventing Adams from using them to benefit NWBC's competitor. NWBC takes great care to protect the secrecy of this information and, even within the company, access to the information is limited. C.R.S. § 7-74-102(4) (defining trade secret as "any . . . confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value;" to be a trade secret, "the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited

purposes."). Where, as here, a non-competition agreement is designed to protect such trade secrets, it is enforced in Colorado. *See Gold Messenger v. McGuay*, 937 P.2d 907 (Colo. App. 1997).

Second, Adams was executive and/or management personnel as contemplated by the statute. Colorado courts have recognized that the purpose of the executive/management personnel provision is "to protect employers from the disruption of operations which occur upon the loss of a key executive or member of his staff" and to "[assure] employers that the very heart of their enterprise—business plans and high-level strategies—will not be subject to accidental (or intentional) disclosure to a competitor." *Phoenix Capital, Inc.*, 176 P.3d at 842 (citations omitted). Here, Adams was NWBC's General Manager and was tasked with overseeing the overall performance of the business unit. As part of this, he was responsible for revenue, costs, budgets, personnel, customer relationships, and overseeing the protection of NWBC's confidential information. He supervised all of NWBC's roughly 70 employees and had significant discretion. Compl. ¶ 15. Given Adams' significant responsibilities, access to sensitive NWBC information, and position in the hierarchy of NWBC, the Restrictions are enforceable.

Third, the duration and geographic scope of the Restrictions are reasonable. Colorado courts have upheld non-competes with durations of three years and longer. *See, e.g., In re Marriage of Fisher*, 834 P.2d 270, 273-74 (Colo. App. 1992); *Harrison*, 577 P.2d at 302; *Boulder Med. Ctr*, 651 P.2d at 464. Here, the duration of the Non-Competition, Non-Solicitation, and Non-Interference Provisions is 1 year. In addition, the geographic scope is reasonably related to the interests to be protected. Specifically, it is limited to places where NWBC or its affiliates are doing business: Idaho, Washington, and "within a 100 mile radius of any other location

outside of those states in which the Company or any other member of the Company Group has sold products or provided services within the 12 months prior to the date of termination." Compl. Ex. 1 at RCA § 1. However, even if the Court were to conclude the restrictions were unreasonable, Colorado courts are authorized to limit noncompetition clauses in order to make them enforceable. *See, e.g., Mgmt. Recruiters, Inc. v. Miller*, 762 P.2d 763, 766 (Colo. App. 1988). Thus, the scope of the restrictions is reasonable, but if the Court finds it necessary, the Court may limit the scope of the Restrictions.

ii.      *Adams Breached and Intended to Breach the Agreement.*

Adams' breaches and threatened breaches of the Agreement are clear. With respect to the Non-Competition Provision, Non-Solicitation Provision, and Non-Interference Provision, Adams is working for BFS, a direct competitor of NWBC, and is approaching and stealing NWBC's customers and jobs to benefit BFS. Moreover, Adams is doing so while pretending to still be affiliated with NWBC, or at a minimum, hiding that he is no longer working with NWBC.

With regard to the Confidentiality Provisions, in violation of his obligations, Adams is using the very information the Confidentiality Provisions are designed to protect (for example, customer information and pricing information), for the benefit of NWBC's competitor, BFS.

iii.      *NWBC Has Performed Its Obligations and Will Be Harmed by Adams' Failure to Perform.*

NWBC has performed under the Agreement, providing Adams with employment and compensation as consideration for Adams' promises. But for the restrictive covenants to which Adams agreed, NWBC would not have paid Adams this compensation. In addition, and as further explained below, NWBC will be greatly harmed by Adams' breach of the Non-Competition, Non-Solicitation, Non-Interference, and Confidentiality Provisions to which he

agreed.  For these reasons, NWBC will succeed on its claim that Adams has breached and will continue to breach the Agreement.

      b.    <u>Claims for Misappropriation of Trade Secrets.</u>

NWBC is likely to succeed on its claims for misappropriation of trade secrets pursuant to the federal Defend Trade Secrets Act and the Colorado Uniform Trade Secrets Acts. Both of these statutes authorize injunctive relief to restrain actual or threatened misappropriation of a trade secret. *See* 18 U.S.C. § 1836(b)); Colo. Rev. Stat. § 7-74-103. For the following reasons, NWBC will succeed on its claims under these statutes.

*First*, the pricing terms, pricing schemes, vendor lists, margins, labor cost calculations and formulas, projections, plans, business finances, and customer lists and other compiled information about the customer, including who the customer's decision makers are and customer preferences, that Adams had access to and is using are classic trade secrets. 18 U.S.C. § 1839(3) defines trade secrets as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

Similarly, Colo. Rev. Stat. § 7-74-102(4) defines trade secrets as:

> [T]he whole or any portion or phase of any scientific or technical information,
> design, process, procedure, formula, improvement, confidential business or
> financial information, listing of names, addresses, or telephone numbers, or other
> information relating to any business or profession which is secret and of value.

Like the federal statute, the Colorado statute requires that the owner "must have taken

measures to prevent the secret from becoming available to persons other than those

selected by the owner to have access thereto for limited purposes." *Id.*

Under both of these definitions NWBC's pricing terms, pricing schemes, vendor lists,

margins, labor cost calculations and formulas, projections, plans, business finances, information

regarding upcoming engagements, and customer lists and other compiled information about the

customer, including who the customer's decision makers are and customer preference, are all

trade secrets. *See, e.g.*, *Network Telecomms., Inc. v. Boor-Crepeau*, 790 P.2d 901, 901-03 (Colo.

App. 1990) (trade secret protection exists for customer information, compiled by the employer,

which provides the employer with "a significant business advantage"); *R & D Bus. Sys. v. Xerox*

*Corp.*, 152 F.R.D. 195, 197 (D. Colo. 1993) (party's "parts and supplies sources, research and

development efforts, market strategy, and customer lists" constituted trade secrets under

Colorado law); *Xantrex Tech., Inc. v. Advanced Energy Indus., Inc.*, No. 07-cv-02324-WYD-

MEH, 2008 WL 2185882, *18 (D. Colo. 2008) ("Detailed customer information is a trade

secret."); *Port-a-Pour, Inc. v. Peak Innovations, Inc.*, 49 F. Supp. 3d 841, 867 (D. Colo. 2014)

(confidential product specifications were trade secret); *Doubleclick Inc. v. Paikin*, 402 F. Supp.

2d 1251, 1258 (D. Colo. 2005) (confidential pricing strategy was trade secret).

In addition, NWBC safeguards its trade secrets as required under the statutes. NWBC

uses fire-walls, antivirus software, intrusion protection and detection systems, encryption

mechanisms, physical safeguards, and regular server backups. NWBC further protects its trade

secrets through limiting access to the information to those employees who need it and using restrictive agreements and initiating litigation, such as this lawsuit, when necessary. Compl. ¶ 11.

*Second*, NWBC will also be able to establish that Adams has misappropriated NWBC's trade secrets. *See* 18 U.S.C. § 1839(5); Colo. Rev. Stat. § 7-74-102(2). A person misappropriates trade secrets under the federal statute when, *inter alia*, he acquires the trade secrets with knowledge that they were acquired by improper means. *See* 18 U.S.C. § 1839(5); *see also id.* § 1839(6) (defining "improper means" to include, *inter alia*, "breach of a duty to maintain secrecy" and "theft"); Colo. Rev. Stat. § 7-74-102 (employing similar definitions); *see also, e.g., Saturn Sys. v. Militare*, 252 P.2d 516, 525 (Colo. App. 2011) (holding that under Colorado law all that is required to establish misappropriation is evidence of "improper…acquisition of the trade secret"); *Sonoco Prods. Co. v. Martinez*, 23 P.3d 1287, 1290 (Colo. App. 2001) ("Misappropriation" requires only the "improper disclosure or acquisition of the trade secret"). Here, NWBC can show both actual and threatened misappropriation. As set forth above, Adams convinced two of NWBC's clients to cancel multiple jobs. He was able to do this because he knew all of the trade secret details about (1) who the clients were, (2) what the orders were, (3) the order pricing, and (4) order timing. Further, NWBC expects Adams will continue to use its trade secrets to compete against it unless and until he is enjoined by the Court.

      c.    <u>Claim for Conversion</u>

NWBC will succeed on its claim for conversion. To prevail on a conversion claim, NWBC must prove: (1) Adams exercised dominion or control over NWBC's property; (2) Adams' exercise of control was unauthorized; (3) NWBC has demanded return of its property; and (4) Adams has refused to return it. *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint.,*

*Inc*., 863 F. Supp. 2d 1066, 1081 (D. Colo. 2012). NWBC satisfies each element of its

conversion claim. Adams has been and is using NWBC's confidential information without

NWBC's permission. NWBC demanded that Adams return its property, and Adams has refused

to do so.

          d.     <u>Claim for Civil Theft</u>

NWBC will also succeed on its Civil Theft claim. To succeed on a claim of civil theft, a

plaintiff must prove: "(1) that the defendant knowingly obtained control over the owner's

property without authorization and (2) that he or she did so with the specific intent to

permanently deprive the owner of the benefit of property." *Itin v. Bertrand T. Ungar, P.C.*, 17

P.3d 129, 134 (Colo. 2000). Adams has been and is knowingly using NWBC's confidential

information without NWBC's permission.  Further, this information is valuable because it is

confidential and unique to NWBC. Adams is using the information with the specific intent of

deprive NWBC of its value.

          e.     <u>Claims for Tortious Interference</u>

NWBC will prevail on its claims for tortious interference with contract and tortious

interference with prospective business advantage.

To succeed on its tortious interference with contract claim, NWBC must prove that

Adams (1) was aware of a contract between NWBC and its clients, (2) intended that the client

breach the contract, and (3) induced the client to breach or made it impossible for the client to

perform the contract. *Duhon v. Nelson*, 126 P.3d 262, 267 (Colo. App. 2005). Similarly, to

prevail on its tortious interference with prospective business advantage claim against Adams,

NWBC must prove that: (1) Adams either induced a third person not to enter into or continue a

contractual relationship with NWBC, or prevented NWBC from acquiring or continuing the

prospective relation; (2) that Adams did so intentionally; and (3) that Adams used wrongful

means to do so.  *See L-3 Commc'ns*, 863 F. Supp. 2d at 1085-86 (citing *MDM Grp. Assocs., Inc.*

*v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo. App. 2007)).  Wrongful means includes fraud

and other conduct that is itself capable of forming the basis for liability for the actor.  *Energex*

*Enters, Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1285 (D. Colo. 2003); *See also Amoco*

*Oil Co. v. Ervin*, 908 P.2d 493, 502 (Colo. 1995), *as modified on denial of reh'g* (Jan. 16, 1996)).

Here, all three elements of each claim are met. Adams wrongfully misrepresented, either

affirmatively or via an intentional omission, his relationship with NWBC. At the time Adams did

so, he knew he was not an employee of NWBC, but passed himself off as an employee to obtain

the business of NWBC's clients and prospective clients. Furthermore, but for Adams'

misconduct, the clients would have performed their contracts and there is a reasonable likelihood

that a contract would have resulted on NWBC's prospective orders absent the interference.  *See*

*L-3 Commc'ns*, 863 F. Supp. at 1086.

       f.      <u>Claim for Unjust Enrichment.</u>

NWBC will succeed on its claim for unjust enrichment. To make out an unjust

enrichment claim, a plaintiff must show that: "(1) at plaintiff's expense, (2) defendant received a

benefit (3) under circumstances that would make it unjust for defendant to retain the benefit

without paying." *Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*, 200 P.3d 1133, 1136 (Colo. App.

2008). Here, Adams has obtained various benefits at NWBC's expense, including the

confidential and trade secret information belonging to NWBC. Under these circumstances, where

Adams has sought new employment with a direct competitor, it is particularly unjust for Adams

to retain these benefits. Adams' retention of NWBC's confidential and trade secret information, which concern NWBC's clients, schedule, pricing, and upcoming orders, is particularly inequitable given that he likely will use these documents to solicit business and/or NWBC's customers on behalf of BFS, which would cause incalculable harm to NWBC.

g.   Claims for Unfair Competition.

NWBC will also prevail on its unfair competition claims under the Lanham Act and common law.

To prove its Lanham Act Unfair Competition claim, NWBC must show that Adams (1) used a false or misleading description or representation of fact, which (2) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person. 15 U.S.C. § 1125(a)(1)(A). Similarly, to prevail on its common law unfair competition claim, NWBC must prove first that Adams "misappropriated plaintiff's name or operations in some regard, and second, that this conduct is likely to deceive or confuse the public because of the difficulties in distinguishing between the plaintiff's and defendant's products and services." *Netquote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1131 (D. Colo. 2007); *Tradebank Int'l Franchising Corp. v. Cmty. Connect, LLC*, Civil Action No. 11-cv-01530-RPM, 2013 U.S. Dist. LEXIS 89110, at *5 (D. Colo. June 25, 2013).

NWBC can prove all of these elements. By intentionally omitting the fact that Adams is no longer employed by or affiliated with NWBC in communications with NWBC's customers, Adams made a misleading representation and misappropriated NWBC's name. Further, this misrepresentation by omission is likely to confuse the public by creating confusion about Adams' association with NWBC. In fact, NWBC is already aware of at least one situation where

someone was confused. NWBC anticipates that through discovery it will find evidence of additional instances where Adams passed himself off as being associated with NWBC. And, as is described in more detail below, Adams' actions have harmed NWBC in the form of lost customers and sales and will continue to do so.

### 2. NWBC Will Suffer Irreparable Harm Absent Injunctive Relief.

Adams' unlawful possession of NWBC's proprietary information, his deceptive actions passing himself off as affiliated with NWBC, and his employment with NWBC's direct competitor make the risk of irreparable harm imminent and incapable of being repaired with money damages. If Adams is permitted to retain NWBC's confidential and trade secret information and not restrained from using it for the benefit of himself and/or NWBC's competitor, NWBC will suffer immediate and significant harm to its business. Indeed, the "resulting loss of competitive advantage . . . could not be undone by money damages." *See Haggard v. Spine*, No. 09-CV-00721CMAKMT, 2009 WL 1655030, at *15 (D. Colo. June 12, 2009) ("money damages would not compensate [trade secret owner] for the resulting injury" where opposing party "disclosed [owner's] customer data and product trade secrets"); *see also Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000) ("potential loss of market advantage has been recognized to constitute irreparable harm"). In addition, monetary damages would be difficult to calculate in this case. Adams has detailed knowledge of NWBC's customer relationships by virtue of his former position at NWBC. NWBC cannot predict the number of clients, or share of the truss market, that it could lose as a result of Adams' conduct. Accordingly, the true and full extent of possible damage to NWBC as a result of

Adams' unlawful conduct is simply impossible to ascertain, and injunctive relief is not only
appropriate, but imperative.

Adams' actions reaching out to NWBC's client and stealing that business illustrate the tip
of the iceberg of the harm that will be caused absent injunctive relief. Unless a client tells
NWBC that they are cancelling the order because Adams reached out, NWBC may have no way
of knowing the extent of the damage it has sustained, including the number of lost clients and the
damage to NWBC's reputation and goodwill.

Because NWBC has no adequate remedy at law and will suffer irreparable harm without
court intervention, the Court should grant NWBC's request for a temporary restraining order and
preliminary injunction. *See Mintel Int'l Grp., Ltd. v. Neergheen, No. 08-CV-3939,* 2008 WL
2782818, at *5 (N.D. Ill. July 16, 2008) (enjoining defendant's use of customer lists, vendor lists,
and strategic information to prevent further damage to plaintiff's competitive advantage).

**3.     The Balance of Hardships Tips in NWBC's Favor and the Restraining Order
Would Not Adversely Affect the Public Interest.**

If NWBC's requests for a temporary restraining order and preliminary injunction are
denied, NWBC will have no method for protecting the business it has developed over the years.
Adams and BFS should not be allowed to usurp the knowledge and experience that has allowed
NWBC to become a leader in the truss industry by way of Adams violating his Agreement and
misappropriating NWBC's trade secrets.

Adams, on the other hand, is not unduly harmed by an injunction. Adams terminated his
employment with NWBC after receiving a substantial buyout of his ownership shares in the
company. He has no legal right to violate the Agreement or to use NWBC's information to
benefit himself or his new employer. In addition, he was earning a significant annual salary with

NWBC. All of this suggests that he is unlikely to suffer any tangible hardship if the Court holds him to the bargains set forth in his Agreement, including the Non-Competition Provision. Thus, the harm NWBC has suffered or will suffer without injunctive relief substantially outweighs any reason for denying NWBC a temporary restraining order and injunction.

Moreover, the public interest favors an injunction in this case. It is in the public interest for contracts to be enforced and for intellectual property rights to be protected. *See Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1165 (D. Colo. 2016) (the public has an interest in protecting valid trade secrets and preventing unfair competition). The public interest is also served by discouraging theft and enforcing contract rights. Thus, looking at this case as a whole, NWBC satisfies the third and fourth criteria for injunctive relief.

## C.    THE COURT SHOULD NOT REQUIRE NWBC TO POST A BOND.

In his Agreement, Adams agreed that NWBC should not have to post a bond in seeking a temporary restraining order or preliminary injunction for breaches of the Confidentiality Provisions. Compl. Ex. 1 § 10(f). Consistent with the Agreement, the Court should dispense with any bond requirements.

## CONCLUSION

The Court should grant NWBC's Emergency Motion for Temporary Restraining Order and Motion for Preliminary Injunction.

Dated:  March 30, 2022

Respectfully submitted,

*/s/ Brett C. Painter*

Brett C. Painter
Emily L. Wasserman
Katie R. Brown
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Ste. 500
Denver, CO 80202
Telephone: 303-892-9400
Facsimile: 303-893-1379
Email: brett.painter@dgslaw.com
Email: emily.wasserman@dgslaw.com
Email: katie.brown@dgslaw.com

*Attorneys for Northwest Building Components, Inc.*